UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL NO. 12-30059-RWZ


UNITED STATES

v.

ZAHIR SE ALLAH


MEMORANDUM OF DECISION

January 10, 2014

ZOBEL, D.J.

Defendant Zahir Se Allah, formerly known as William Barnett, Jr., was indicted

on one count of possession with intent to distribute cocaine base in violation of 21

U.S.C. § 841.  He now moves to suppress all evidence seized by police officers

following an investigatory stop and arrest.  The court held an evidentiary hearing on

December 12, 2013.  Based on the evidence presented, defendant's motion is allowed.

## I.  Background

The court heard testimony from three members of the Springfield Police

Department ("SPD") – Sergeant Steven Kent, Detective Gregg Bigda, and Officer Barry

Delamarter – and defendant's girlfriend Nychele Cassell.

On the afternoon of August 10, 2012, members of the SPD narcotics and street

crimes units, led by Sergeant Kent, set up surveillance at Girard Avenue and Bay

Street in Springfield, a high-crime area known for drug distribution, firearms offenses,

and gang activity.  At 347 Bay Street, on the corner of Girard Avenue, is a multi-family

residence with a parking area in the rear.  Adjacent to this parking area, at 15 Girard

Avenue, is another parking lot for a high-rise housing project at that address.  Sergeant

Kent, a twenty-two-year veteran of the SPD and a supervisor in the narcotics division,

parked on Girard Avenue near the intersection of Bay Street in an undercover police

vehicle.  From his location, he was able to view the intersection several hundred feet in

either direction, as well as 347 Bay Street and its rear parking area.  Sergeant Kent

testified that he selected that particular spot for surveillance because he and other

officers were familiar with 347 Bay Street as the site of frequent criminal activity,

including drug offenses.

At approximately 1:35 p.m., Sergeant Kent observed a white newer-model

Chevrolet[1] with Connecticut license plates drive past him on Girard Avenue, turn right

on Bay Street, and then take another immediate right into the driveway of 347 Bay

Street.  The vehicle piqued Sergeant Kent's interest because its model, like-new

condition and out-of-state registration led him to suspect it was a rental vehicle.

Sergeant Kent testified that in his experience, drug distributors routinely use rental

vehicles in order to avoid detection by law enforcement and forfeiture in the event of an

arrest.

An older black male in a red shirt appeared to be loitering in the rear parking lot

of 347 Bay Street.  When the Chevrolet arrived, he looked around the neighborhood

before walking up to the driver's side window and leaning in.  Sergeant Kent, despite

---

[1]  While Sergeant Kent recalled the vehicle as a Chevrolet Malibu, counsel and witnesses for
both parties referred to it as a Chevrolet Impala throughout the hearing.

using binoculars, was unable to view what transpired between the older black male and the driver.  Approximately 30 to 45 seconds later, the older black male walked away from the vehicle, looking at an item in the palm of his right hand as he entered the building.  The Chevrolet then pulled out of the parking lot, took a left onto Bay Street, and turned back onto Girard Avenue, driving past Sergeant Kent's parked vehicle. Sergeant Kent recognized the driver, a black male later identified as defendant, as an individual with the last name "Barnett" whom he had arrested several years prior for drug distribution and who was connected with a local street gang that engaged in drug sales.[2]  The Chevrolet immediately turned into the parking lot at 15 Girard Avenue where a young black woman, defendant's girlfriend Nychele Cassell, was standing.

Sergeant Kent – based on the location, observed conduct, and his prior experience – believed he had just witnessed a retail drug transaction, specifically one for crack cocaine.  Using his police radio, he contacted other SPD officers stationed nearby and directed them to enter the parking lot of 15 Girard Avenue and conduct an investigatory stop of the driver.  Sergeant Kent relayed that he believed the driver had engaged in a drug sale behind 347 Bay Street and provided a physical description of the driver as well as of the vehicle along with its tag number.  Once he observed the other officers driving towards 15 Girard Avenue in response to his call, Sergeant Kent pulled out of the area to avoid compromising his undercover status.

---

[2] Sergeant Kent initially stated that he recognized the driver as "Charles Barnett."  However, he later confirmed during the hearing that defendant, whose former name is William Barnett, Jr., was the individual he had observed driving the white Chevrolet and whom he had previously arrested.

Detective Bigda and Officer Delamarter were among several SPD officers who arrived at 15 Girard Avenue in three or four police vehicles to conduct the stop.[3] Detective Bigda testified that he observed the Chevrolet with Connecticut plates in the parking lot and pulled his vehicle directly behind it to block it from leaving.  As he approached the Chevrolet on foot, Detective Bigda realized that it was empty.  Parked next to the Chevrolet, separated by one parking space from the passenger side, was a darker-colored vehicle with a black male fitting the description given by Sergeant Kent in the driver's seat with the door wide open.  Detective Bigda indicated to the other officers that the man they were looking for, defendant, was in the second vehicle.  He then saw defendant lean forward and reach into the small of his back with his right hand.  Believing defendant may have been reaching for a weapon, Detective Bigda alerted the other officers by yelling "He's reaching! He's reaching!"  At that point Officer Delamarter and other officers approached the driver's side door of the second vehicle and ordered defendant to show his hands and get out.  They secured defendant in handcuffs, conducted a pat-frisk, and checked the immediate area for weapons but did not find either weapons or contraband.

The officers' testimony about the subsequent events presents a somewhat muddled account.  Detective Bigda testified that after the pat-frisk he went to the nearest police cruiser, one that had been driven by Officer Delamarter, and entered defendant's "original name" (i.e., Barnett) and date of birth into the mobile computer

---

[3]  There were seven or eight officers working the surveillance detail that day, but not all were present during the stop and arrest of defendant.  Detective Bigda recalled at least three other officers with him at the scene.

system.  When asked how he had known those biographical particulars, Detective

Bigda indicated that Sergeant Kent had given him the Barnett name and that one of the

other officers had requested a date of birth from defendant.  Within seconds, the

computer query allegedly revealed that defendant's license was suspended under the

Barnett name.  Detective Bigda relayed this to the other officers, who then informed

defendant he was under arrest for driving with a suspended license and placed him in

the rear of a police vehicle.

Officer Delamarter's testimony included different details.  He did not recall

Sergeant Kent providing a name for defendant in his transmissions, but understood that

one of the purposes of the investigatory stop was to identify the driver of the Chevrolet.

Following the pat-frisk, Officer Delamarter asked defendant his name and date of birth,

and defendant gave the name "Zahir Allah."  Officer Delamarter testified that someone

ran a computer check under that name and did not find any records in the

Massachusetts registry.  He did not ask defendant for another name, however, because

"by that point it had already been determined who he was . . . by Detective Bigda," Tr.

at 146 (Docket # 55), who advised the officers that defendant's license was suspended.

Officer Delamarter did not know how Detective Bigda was made aware of defendant's

former name.  Neither officer testified to anyone ever asking defendant for his driver's

license, and did not know or could not recall whether defendant had a license with him.

The sole exhibit submitted during the hearing was a three-page document

showing police computer queries made that day, August 10, 2012, but which was

printed some days later.  The first page of document indicates that on August 10, 2012,

at approximately 1:44 p.m., information about a particular driver's license number was requested from a computer under Officer Delamarter's log-in name.[4]  The second page indicates that on that same date, around that same time, there were queries made from Officer Delamarter's log-in about the name "Zahir Allah."  The third page, apparently showing queries for the name "William Barnett" on that date, indicates "[n]o results returned."  Gov't Ex. 1 (Docket # 54).

The officers estimated that approximately ten to fifteen minutes elapsed from the time Sergeant Kent first observed the Chevrolet entering 347 Bay Street until defendant was arrested.  A search of the white Chevrolet at the scene uncovered paperwork indicating that it was a rental vehicle.  The Chevrolet was later driven to the police station for another search, but there was no testimony as to whether anything more was found or seized from the vehicle.

Nychele Cassell testified to a starkly different version of the events at 15 Girard Avenue.  Cassell resides in the housing complex at that address.  At approximately 1:00 p.m. on August 10, she found that her vehicle, a gray Lexus, would not start.  She called defendant and asked if he would come over to look at her car.  Defendant agreed, and after about ten minutes, drove into the parking lot in a white Chevrolet and parked next to Cassell's Lexus.  Defendant then got into the driver's seat of the Lexus and unsuccessfully attempted to start it several times.  Defendant and Cassell got out of the Lexus, at which point four police vehicles pulled up and blocked them in.  Cassell testified that several police officers emerged with their guns drawn, immediately

---

[4] There was no evidence as to whose driver's license number was the subject of these queries.

handcuffed defendant, and placed him in the back of a police car. Cassell claimed the officers did not pat-frisk defendant or speak to him at all. They then handcuffed Cassell and had her stand for twenty to twenty-five minutes in the rain while they conducted a full search of her Lexus.[5] The Chevrolet was not searched at the scene, but was instead driven away.

Following his arrest, defendant was transported to the police station. Officer Delamarter testified that at some point he was in an office at the station when he heard noise outside. He came out of the office and saw another officer holding defendant down on a bench. The officer pointed to an object on the floor and directed Officer Delamarter to pick it up. Officer Delamarter recovered the object, which was a bag containing a substance that appeared to be crack cocaine.

## II. Legal Standard

Under established Fourth Amendment doctrine, law enforcement officers "may stop and briefly detain an individual for investigative purposes if [they] have a reasonable suspicion that criminal activity is afoot." United States v. Dapolito, 713 F.3d 141, 147 (1st Cir.2013). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them," United States v. Arvizu, 534 U.S. 266, 273 (2002), but reasonable suspicion cannot rest on a mere hunch; rather, they "must be able to point to specific and articulable facts" justifying the stop, Terry v. Ohio, 392 U.S. 1, 21 (1968). During

---

[5] Both Detective Bigda and Officer Delamarter acknowledged seeing Cassell at 15 Girard Avenue, but could not recall whether she was handcuffed. Officer Delamarter testified that the officers did a very quick search of the Lexus after removing defendant from the driver's seat to ensure there were no weapons within reach. He could not recall whether anyone searched the full interior or trunk of the Lexus.

an investigatory stop, officers may also conduct a limited pat-frisk of a person's outer clothing for weapons for the officers' safety and the safety of others.  Id. at 30.  In determining whether there was reasonable suspicion, the court must look to the facts "available to the officer at the moment of the seizure or the search," taking into account the "totality of the circumstances."  Id. at 22.

A warrantless arrest is permissible when an officer has probable cause to believe that a person committed a crime.  United States v. Watson, 423 U.S. 411, 417-24 (1976).  "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime."  United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir.1997)).  "Officers may perform searches incident to constitutionally permissible arrests in order to ensure their safety and safeguard evidence."  Virginia v. Moore, 553 U.S. 164, 176 (2008).

## III.  Discussion

Defendant argues that the officers lacked both reasonable suspicion to conduct an investigative stop and probable cause to arrest him, such that any evidence recovered as a result must be suppressed.[6]

### A.  The Investigatory Stop and Pat-Frisk

Considering the totality of the circumstances, I find the police officers had

---

[6]  Defendant has not specified precisely what evidence, aside from the bag allegedly containing crack cocaine, he is seeking to suppress.  Defense counsel alluded to items that may have been found and seized by police from the Chevrolet after defendant's arrest.  The court will assume that defendant's challenge also pertains to any such items.

reasonable suspicion to support an investigatory stop of defendant.  The officers were

conducting surveillance in a high-crime area noted for drug distribution and gang

activity.  Sergeant Kent is an experienced narcotics investigator who had personally

observed thousands of retail drug sales, including in the area around Bay Street and

Girard Avenue.  On the relevant afternoon, Sergeant Kent witnessed conduct that, in

his experience and training, was consistent with a drug transaction: the operator of

what appeared to be a rental vehicle had a brief encounter in the parking lot with an

individual who afterwards walked away while looking at something in the palm of his

hand.  Moreover, as the Chevrolet drove past him following the alleged sale, Sergeant

Kent recognized the driver as someone he had previously arrested for drug distribution

and who was affiliated with a local gang.

While "[a]n individual's presence in an area of expected criminal activity,

standing alone, is not enough to support a reasonable, particularized suspicion that the

person is committing a crime," the fact that the stop occurred in a "high crime area" is a

relevant consideration in the Terry analysis.  Illinois v. Wardlow, 528 U.S. 119, 124

(2000).  Moreover, "[a] police officer's knowledge of an individual's prior criminal activity

is material to whether the officer reasonably suspects that criminal activity has or may

be occurring."  United States v. Kimball, 25 F.3d 1, 7 (1st Cir.1994).  Sergeant Kent's

interpretation of the conduct he observed at 347 Bay Street is entitled to a measure of

deference.  See United States v. Brown, 621 F.3d 48, 56 (1st Cir. 2010) ("It is well

established that the observations of experienced law enforcement officers are entitled

to deference."); United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008) (determination

9

of reasonable suspicion "entails a measurable degree of deference to the perceptions of experienced law enforcement officers.").  Those observations, combined with his familiarity with the area, experience in narcotics investigations, and knowledge of defendant, gave Sergeant Kent ample basis to reasonably suspect that defendant was engaged in criminal activity and therefore direct an investigatory stop.[7]

The officers were also justified in conducting a pat-frisk of defendant.  "Once an officer has formed a reasonable belief that a detained person may be armed and dangerous, a pat-down for protective purposes is, without more, deemed reasonably related in scope to the stop."  Rudiaz, 529 F.3d at 33.  Here, Detective Bigda testified that as the officers approached the Lexus, he saw defendant lean forward and reach into the small of his back.  Detective Bigda, in light of his training and experience, believed this motion indicated defendant was potentially reaching for a weapon and alerted his fellow officers.  Upon that warning, Officer Delamarter and others secured defendant and pat-frisked him for weapons to ensure the officers' safety.  I credit the officers' testimony in this regard and find that the pat-frisk was justified by legitimate safety concerns and a reasonable suspicion that defendant may be armed.

Defendant argues that the manner, duration, and scope of the investigatory stop converted the encounter into a de facto arrest that lacked probable cause.  He

---

[7]  In ordering the stop, Sergeant Kent communicated to his team that he believed he had just witnessed defendant engage in a drug sale.  Sergeant Kent's reasonable suspicion can be imputed to the other officers who actually conducted the stop under the "collective knowledge" doctrine.  See United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007) (Under the collective knowledge doctrine, "reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion."); United States v. Winchenbach, 197 F.3d 548, 555 (1st Cir. 1999) ("[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation.").

contends that, as testified to by Cassell, he was surrounded by police cruisers, held at gunpoint, handcuffed and placed in the back of a police vehicle without explanation for a considerable period of time. The government challenges key aspects of this account: although the police vehicles were positioned in order to prevent defendant from leaving the parking lot, the officers denied drawing their service weapons, used the handcuffs out of reasonable concern for their safety, and only arrested defendant after learning that his license was suspended.

"There is no scientifically precise formula that enables courts to distinguish between valid investigatory stops . . . [and] '*de facto* arrests.'" United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). Instead, the central inquiry is whether "a reasonable person in the suspect's position would have understood, given the circumstances, that he was essentially under arrest." United States v. Mohamed, 630 F.3d 1, 6 (1st Cir. 2010), cert. denied, 131 S.Ct. 2127 (2011). Relevant factors include "the location and duration of the stop, the number of police officers present at the scene, the degree of physical restraint placed upon the suspect and the information conveyed to the suspect." United States v. Rabbia, 699 F.3d 85, 91 (1st Cir. 2012).

In light of the circumstances, the officers' actions did not exceed the reasonable scope of an investigatory stop. I do not find Cassell's account credible and instead credit the officers' version of the stop. The encounter took place in public and lasted only minutes. While there were several officers at the scene, they did not brandish their weapons, voice threats, or physically strike defendant. See Zapata, 18 F.3d at 975 (finding no de facto arrest in stop involving multiple officers where encounter

occurred in a public setting and officers did not draw weapons or threaten suspect). The use of handcuffs is "one of the most recognizable indicia of a traditional arrest," United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998), but that alone is not determinative.  See United States v. Chaney, 647 F.3d 401, 409 (1st Cir. 2011); United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005) ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest.").  "When officer safety is a legitimate concern, a Terry stop appropriately may involve the application of handcuffs."  United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011).  In this instance, as already described above, the officers had reason to suspect that defendant may be armed and dangerous.  Based on the environment and their observations, the officers were justified in placing defendant in handcuffs and conducting a pat-frisk to ensure their safety.  Such actions, viewed in context, did not convert the investigatory stop into de facto arrest.

**B. The Arrest**

I now turn to whether defendant's actual arrest was justified.  The government advances three separate arguments for finding that the officers had probable cause to arrest defendant.  First, Sergeant Kent's observations of the alleged drug transaction provided probable cause to arrest defendant for a distribution offense.  Second, the officers had probable cause to arrest defendant as William Barnett for driving with a suspended license.  Third, the officers had probable cause to arrest defendant as Zahir

Allah for driving without a license at all.[8]  The evidence fails to support the

government's case on all three grounds.

Sergeant Kent's observations of defendant at 347 Bay Street, while sufficient to

form a reasonable suspicion that defendant may have been distributing drugs, did not

constitute probable cause to arrest for that offense.  Sergeant Kent saw very little of the

actual interaction between defendant and the older black male at 347 Bay Street; he

testified that he was unable to view either man's hands or whether anything was ever

exchanged.  He had no information about the older black male and did not know if he

was a drug user, and the older black male was not followed or questioned after the

alleged transaction.  While Sergeant Kent suspected that the Chevrolet was a rental

and believed drug dealers often utilize rental cars, he did not query the license plate at

that time and acknowledged that people other than drug dealers also rent vehicles.

Moreover, the officers learned nothing from their investigatory stop of defendant that

would suggest he was selling drugs.  They found no weapons, drugs, or other

contraband on defendant's person or in his immediate vicinity and, apart from his

inconsequential reaching behind his back, there is no evidence that defendant

exhibited suspicious behavior during the stop.  See Wardlow, 528 U.S. at 126 ("If the

officer does not learn facts rising to the level of probable cause [during an investigatory

stop], the individual must be allowed to go on his way.").  Under the circumstances, the

---

[8] It is immaterial which offense the officers actually charged in arresting defendant so long as
there was probable cause to arrest for some crime.  See Jones, 432 F.3d at 41 ("[T]he probable cause
inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon
whether the facts known at the time of the arrest objectively provided probable cause to arrest.  Thus, it
is irrelevant that the booking officer cited Jones for 'intent to rob while armed.' If, on the facts known to
the arresting officers, there was probable cause to believe he was committing another crime, the arrest
was valid.") (citing Devenpeck v. Alford, 543 U.S. 146, 153-54 (2004)).

officers did not have probable cause to arrest defendant for drug distribution.

The government also claims that the officers had probable cause to arrest defendant for driving with a suspended license or without a license.  If in fact the officers discovered that defendant lacked a license, or that it was suspended, they would have had probable cause to arrest him for those crimes.  See MASS. GEN. LAWS ch. 90, §§ 10 and 23.  However, the evidence regarding either offense is contradictory and unpersuasive.

Probable cause to arrest defendant for driving with a suspended license hinges on the testimony of Detective Bigda, who allegedly queried defendant's "original name" in the police computer system and found that he had a suspended license.  As an initial matter, it is not apparent exactly how and when Detective Bigda discovered defendant's former name in order to run a records check.  Detective Bigda claimed that he obtained the Barnett name from Sergeant Kent, but Sergeant Kent did not testify to ever giving defendant's name in his transmissions to the other officers and, in fact, expressed some confusion over defendant's first name during the hearing.  Officer Delamarter did not recall Sergeant Kent communicating defendant's name and considered one of the purposes of the investigatory stop to be to identify defendant.  According to the testimony, defendant gave his name only as Zahir Allah and never identified himself as William Barnett.

Even assuming that Detective Bigda did indeed get defendant's full original name from Sergeant Kent, computer records (Gov't Ex. 1) belie his testimony that he ran that name through the computer system at the time of the stop.  The records reflect

queries that were conducted that day and time under a specific driver's license number (which was never identified nor explained at the hearing) and under the name "Zahir Allah."  In contrast, the document shows "no results" for queries run for the name "William Barnett."  This suggests that, contrary to Detective Bigda's testimony, a computer check of William Barnett was *not* run during the stop and therefore could not have indicated a suspended license.  Without such information, the police did not have probable cause to arrest defendant for that offense.

The government argues in the alternative that the arrest was nonetheless justified because defendant was driving without a license.  However, there was no evidence at the hearing that the officers had any reason to believe that defendant did not have a license.  Neither Detective Bigda nor Officer Delamarter testified that anyone ever asked defendant for his license, and neither could recall whether defendant had one on his person.  The computer query of "Zahir Allah" allegedly came back with no record found, which the government maintains is proof that defendant had no license.  But as Officer Delamarter testified, the lack of a record does not necessarily indicate the lack of a license; it simply means that the individual does not appear in the Massachusetts registry of motor vehicles.  It is unreasonable to conclude that an individual without a Massachusetts driver's license has no driver's license at all, particularly where the vehicle being driven has out-of-state plates.  In short, the officers had no verification that defendant was driving without a license, and thus did not have probable cause to arrest him on that basis.

Because the officers lacked probable cause to arrest defendant, the fruits of that

arrest, including the bag allegedly containing crack cocaine, must be suppressed.

## IV.  Conclusion

Defendant's motion to suppress (Docket # 42) is ALLOWED.


_____January 13, 2014_____                    _____/s/Rya W. Zobel_____
            DATE                                                       RYA W. ZOBEL
                                                          UNITED STATES DISTRICT JUDGE


16